# GARFIELD v. UNITED STATES EX REL. STEVENS.

## GARFIELD v. SAME.

## GARFIELD v. SAME.

APPEAL AND ERROR; OFFICERS; APPEAL BONDS; CONSTITUTIONAL LAW;
DUE PROCESS OF LAW; ATTORNEYS, DISBARMENT OF; MANDAMUS.

1. *It would seem* that an appeal to this court by the Secretary of the
   Interior from a judgment of the supreme court of the District of
   Columbia, directing the issuance of the writ of mandamus to the
   Secretary, comes within the spirit, although not within the strict
   letter, of sec. 1000, U. S. Rev. Stat., U. S. Comp. Stat. 1901, p. 712,
   providing that every justice or judge signing a citation or any writ
   of error, except in cases brought by the United States or by direc-
   tion of any department of the government, shall take an appeal bond
   from the plaintiff in error, so as to exempt the Secretary from the
   requirement of giving an appeal bond.

2. Although this court is not expressly named in sec. 1001, U. S. Rev.
   Stat., providing that, on an appeal to the Supreme Court of the
   United States, or the circuit courts by the United States, or by direc-
   tion of any department of the government, no appeal bond shall be
   required,—that section, read in connection with sec. 1000, applies to
   an appeal to this court by the Secretary of the Interior from a
   judgment of the supreme court of the District of Columbia directing
   the issuance of the writ of mandamus to compel him to do an official
   act, when the appeal is taken by his own direction, or by direction
   of the head of another executive department; and the Secretary is,
   therefore, not required to give an appeal bond.   (Reaffirming *Leon-
   ard* v. *Rodda*, 5 App. D. C. 256, and citing *Palmer* v. *Thompson*, 20
   App. D. C. 273.)

3. Secs. 1000 and 1001, U. S. Rev. Stat., allowing the United States and
   Federal officers, upon direction of the heads of departments, to take
   appeals, without giving bond, in all cases involving a public inter-
   est, are not inconsistent with, and repealed by, D. C. Code, sec. 1282,
   31 Stat. at L. 1391, chap. 854, requiring the lower court, in cases of
   an appeal by the defendant in a mandamus case, to fix the penalty
   of the appeal bond necessary to be given to stay execution.

4. An appeal by the Secretary of the Interior from an order of the lower
   court directing the issuance of the writ of mandamus to compel him,
   to reinstate an attorney whom he has disbarred from practice before
   his department, when taken at the direction of himself and the
   Attorney General, is within the provisions of secs. 1000 and 1001, U.
   S. Rev. Stat., dispensing with the necessity of an appeal bond in
   cases appealed by the United States, or by direction of any depart-
   ment of the government; and no appeal bond is therefore necessary.
   (Citing *Roberts* v. *Valentine*, 13 App. D. C. 38.)

5. *Quœre,* whether a special appeal to this court may be granted by two
   of its members when they are beyond the limits of the District of
   Columbia and are apart from each other.

6. By merely taking *ex parte* depositions upon which charges are subse-
   quently based against an attorney practising before the Interior
   Department, the Secretary of that department does not exceed his
   jurisdiction or deny due process of law to the attorneys; but upon
   the charges so made, if they are not admitted, the Secretary is not
   empowered to disbar the attorneys, in the absence of evidence sub-
   mitted in the usual way, with opportunity to the attorneys to hear
   and examine the witnesses, and to introduce proofs in their own behalf.

7. The Secretary of the Interior does not exceed his jurisdiction and act
   without due process of law in a proceeding to disbar attorneys from
   practice before his department, where, without notice to the attor-
   neys, or opportunity on their part to be confronted by the witnesses,
   he makes an *ex parte* investigation of a statement made by them in
   their defense of the charges, to the effect that the practice with
   which they are charged has long been known to the officials of the
   department, and acquiesced in by the department, where it appears
   that the investigation was made by the Secretary for the sole purpose
   of securing information as to the conduct of his subordinates in such
   matters; and that, in afterwards disbarring the attorneys, he held
   as a matter of law that the alleged facts, if true, constituted no
   ground of defense to, or justification of, such practice.

8. Where, in a mandamus proceeding by a firm of attorneys against the
   Secretary of the Interior to compel him to vacate an order dis-
   barring them from practice, the relators claimed in their petition

that the order of disbarment was partly based upon depositions taken by him without notice to them, while the Secretary, in his answer, denied that he had considered such depositions in reaching his conclusion, claiming that the depositions had been taken only during a general investigation of attorneys practising before the department prior to the preferring of the charges against the relators, and that his order of disbarment was not based upon them, but was based upon the answer of the relators to the charges, which answer, in his judgment, contained a substantial admission of the charges, this court, upon a review of the pleadings and exhibits, *reversed* an order of the lower court sustaining a demurrer to the answer and directing the issuance of the writ, on the ground that, the respondent having jurisdiction to determine the weight of the alleged admission as evidence, the soundness of his conclusion could not be inquired into by the court.

9. A proceeding to disbar attorneys is not a criminal proceeding.

10. Any conduct on the part of an attorney, violative of the ordinary standards of professional obligations and honor, is unprofessional and disreputable.

11. Under sec. 5 of the act of Congress of July 4, 1884 (23 Stat. at L. 101, chap. 181, U. S. Comp. Stat. 1901, p. 2321), authorizing the Secretary of the Interior to exclude from practice before his department any attorney shown to be incompetent or disreputable, or who refuses to comply with the rules and regulations of the department, or who shall with intent to defraud, or in any manner, deceive, mislead, or threaten any claimant by word, circular, letter, or by advertisement, the Secretary has power to disbar an attorney practising before his department; and if, in a disbarment proceeding, he finds there is sufficient evidence to show conduct violative of the rules and regulations, his judgment is not subject to review by the courts; and it is immaterial whether matter merely showing that the attorney is disreputable can be the ground of an action under the statute.

12. Where the Secretary of the Interior disbars two attorneys practising before his department, and also the firm of which they are members, two persons who are not named in the disbarment order, and who have never been admitted to practice before the department, but who claim to be members of the firm, are neither necessary nor proper parties to a mandamus proceeding to compel the Secretary to restore the relators to practice.

Nos. 1930, 1934, and 1941.   Submitted October 13, 1908.   Decided November 6, 1908.

HEARING on an appeal by the respondent, the Secretary of the Interior, from an order of the Supreme Court of the District of Columbia, sustaining a demurrer to his answer to a petition for the writ of mandamus, and directing the issuance of the writ to compel him to vacate an order disbarring the relators from practice as attorneys before his department and to restore them to the roll of attorneys; and also upon motions by the relators to dismiss the appeal, and also to dismiss certain other appeals by the respondent which had been specially allowed by this court, on the ground that the appellant had failed to give an appeal bond.                *Order reversed and motions denied.*

The COURT in the opinion stated the facts as follows:

This is an appeal by James R. Garfield, Secretary of the Interior, from an order directing a writ of mandamus to him to vacate an order made by him as Secretary of the Interior on May 1, 1908, disbarring Eugene E. Stevens, Thomas R. Harney, and the firm of Milo B. Stevens & Company, and to restore them to practice before the Department of the Interior, its bureaus and offices.

The petition against the respondent, Garfield, alleges that he was, on April 13, 1907, and has been continually since, Secretary of the Interior for the United States.

That, on November 23, 1896, one Milo B. Stevens and Eugene E. Stevens were partners under the firm name of Milo B. Stevens & Company, practising before the Department of the Interior and the several bureaus thereof, having been duly admitted thereto.  That Milo B. Stevens died November 23, 1896, and, on December 2, 1896, the relators, Eugene E. Stevens, Thomas R. Harney, Martha G. Harney, then Martha G. Stevens, widow of Milo B. Stevens, and Evelyn Stevens, by her guardian, Martha G. Stevens, now Harney, became, and have continually since been, copartners under the said firm name of Milo B. Stevens & Company, and practitioners before said department.

That neither Martha G. Harney, nor Evelyn Stevens, has

been formally admitted to practice before said department, but Eugene E. Stevens and Thomas R. Harney were duly and formally admitted to practice, and, with the knowledge of respondent, they, with their copartners aforesaid, have been engaged in said practice as constitutent members of the firm of Milo B. Stevens & Company.

That, on April 13, 1907, relators Eugene E. Stevens and Thomas R. Harney were served with a citation charging them, under the name of Milo B. Stevens & Company, with improper, unprofessional, and illegal conduct, in connection with certain claims for military bounty land.

That said parties were orally heard before the respondent, and filed a statement in reply to said charges. That afterwards respondent, upon the consideration of these so-called answer, testimony, and argument, promulgated an order, on May 1, 1908, disbarring said relators and the firm of Milo B. Stevens & Company from practice before said department. That thereafter relators made an application for reconsideration of said action, which was denied. That, in their answer, relators relied in part defense upon an alleged practice of purchase, by practitioners before said department, of land warrants from their clients, long well known to and suffered and permitted by said department without objection or condemnation, which has become and was known as "a kind of common-law custom or usage in the transaction of such business, and in the practice in such class of cases."

That, nevertheless, upon an *ex parte* investigation and report of certain subordinate officials of said department, and without opportunity to relators to participate in such investigation, or to support, by the production of witnesses, their allegations in the premises, the respondent decided the contention of the relators in that behalf adversely to them, and in part rested his conclusion and decision upon the pretended adjudication that such practices did not exist and had not existed; whereby relators were deprived of due process of law, and of the opportunity to make good their defense.

That relators have, through much advertising and labor, built up a lucrative business and practice before the said de-

partment, and have more than 42,000 claims for pensions and more than 250 for patents, pending in said department, the fees in which have been partly and in some cases fully earned; and the order disbarring them will utterly destroy their said business.

That neither Martha G. Harney, nor Evelyn Stevens, was cited to answer said charges, nor was offered an opportunity to be confronted with the witnesses produced in support thereof, and were not within the jurisdiction of the respondent.

That relators have no right of appeal or writ of error from the action of the respondent, and no relief save through the writ of mandamus. The citation, answer thereto, and brief in support of relator's contention before the respondent are made exhibits to the petition, and will be referred to later.

The amended answer of the respondent alleges the following facts substantially.

Rule 5 of the regulations prescribed by the Secretary of the Interior, under authority of the act of July 4, 1884, in regard to admissions to practice, requires that in the case of a firm the names of the individuals composing the same must be given, and a certificate and oath as to each member of the firm will be required; and, under this rule, it has been the practice to decline to recognize a firm unless each member thereof has been admitted to practice and is in good standing.

After the death of Milo B. Stevens in 1896, and upon motion of Eugene B. Stevens as sole surviving member of said firm of Milo B. Stevens & Company, and upon the statement of Eugene E. Stevens and Thomas R. Harney that they had formed a copartnership, they were permitted to practice before the department under the firm name of Milo B. Stevens & Company, on June 24, 1897, upon the condition precedent that they should procure from the legal representatives of the late Milo B. Stevens a statement that no objection is had to the use of the said firm name of the new firm; further, that said Stevens and Harney shall not take into partnership any new persons to practice under said firm name; and, further, that the said Stevens and Harney shall file a joint statement duly authenticated, accepting the terms aforesaid.

The said parties filed the affidavit of the widow of Milo B. Stevens as required, and accepted the terms of said admission to practice.

That said Martha G. Stevens, widow of Milo B. Stevens, became the wife of Thomas R. Harney, October 19, 1898, and Evelyn Stevens is the daughter of said Milo B. Stevens. Neither of them has been admitted to practice before the department, as individuals or members of the firm of Milo B. Stevens & Company, nor was disbarred by said order of May 1, 1908, and therefore has no status to join in the petition for mandamus. The said parties never had been admitted to practice, and the department officials had no knowledge that they were members of said firm of Milo B. Stevens & Company, as admitted to practice.

The alleged averment that the practice of attorneys to purchase land warrants of their clients was known to and acquiesced in by the department officials is denied. That said claim is not a legal defense to the charges made, and was not so considered by respondent. The investigation of these charges of knowledge and so forth by officials of the department was made by the respondent to inform himself regarding the same, but not by way of meeting any defense founded thereon, as the sufficiency of the averment as a defense was not recognized.

It is not true that, upon such investigation, the respondent decided the said contention against relators, for, in reaching his final decision, he did not consider the said facts, as in his opinion the defense, if true, had no merit. There was therefore no denial of due process of law in the premises.

The relators were charged in detail in the citation with specific acts of misconduct, and given thirty days to answer the same. The answer thereto admitted the doing of the acts charged, but denied that, by reason thereof, they were guilty of any offense. They submitted certain evidence in their behalf, which consisted, among other things, of receipts procured from their clients for the sums of money they had been charged with improperly procuring from them, showing payments made to them of said profits after the institution of the proceedings against relators. These receipts show payments, after the insti-

tution of the disbarment proceedings, of sums of money varying from 50 to 600 per cent more than the amounts they had
originally paid to their clients.   This difference they had retained for their own profit, and the defense founded on said
receipts was that they had made restitution.   On this record, it
was not necessary to produce any witnesses to prove the facts
which the relators admitted in their answers and in the evidence offered in support thereof.   It became solely a question
whether, on the admitted facts, the charges were sustained, and
whether the relators had violated the provisions of the act of
July 4, 1884, and the laws, rules, and regulations of the department governing the practice of attorneys practising before the
same.   Relators were permitted to make all the arguments desired, and appeared in person and by attorney at the hearing.
Relators were not denied the right to be confronted with witnesses, or to refute the testimony with witnesses.   The fact is
that no witnesses were produced because relators admitted the
facts stated in the citation.   There was no testimony offered to
be refuted, and relators did offer all the testimony they desired
in answer to said charges.

   Respondent admits that, before the issuance of citation, and
before any charges were made, the Commissioner of Pensions
had caused an investigation to be made concerning improper
practices in the department, which had no particular relation to
these relators; and, in the course of this investigation, it was
shown, by depositions taken, that certain attorneys were trafficking with their clients by procuring assignments of their land
warrants at grossly inadequate prices, and selling the same at
their market value, thereby reaping a large profit.   This investigation was made only for the purpose of informing the Commissioner of Pensions as to the conditions obtaining in his
bureau, and at the time of the same or during its continuance it
was not and could not be known whether the relators or any
other persons would be charged with any offense as the result
thereof, or that the investigation would disclose sufficient
ground to charge them with any offense.   After the investigation was concluded, it was concluded by the Commissioner
that there was reasonable ground to charge the relators with im

proper practices, and he then issued his citation in which were embodied the specific acts which the relators were called upon to answer. This citation became the basis of the proceedings and was the only accusation made. Up to this time relators were under no legal charge which they were compelled to answer, and, under the circumstances, no notice was given to them of the taking of the deposition.

When they were charged by the issue of the citation they made their response admitting the purchase by them of warrants as alleged, but denying any wrongful intent, and their liability under said charges, and the jurisdiction of the Secretary to entertain the same.

That all the time demanded was given respondents to be heard, and after hearing them the Commissioner made a report to respondent recommending the disbarment of relators.

Thereafter respondent granted them a full hearing in person and by counsel. While objections were made that the depositions upon which the citation was based were taken without opportunity to the relators to cross-examine the witnesses, the real contention was that the acts charged and admitted did not fall within the law, and the jurisdiction of respondent to make the same the basis of disbarment; and that, even if respondent should decide that the offenses charged and admitted were of sufficient gravity to disbar relators, they had made restitution to their clients of the sum of $6,841.95 by repaying moneys improperly obtained from twenty-two of them, and for that reason clemency should be shown. In support of this, the following extract is quoted from the brief of counsel, filed with respondent: "Tried by every standard, they have not been guilty of any conduct meriting the action recommended. On the contrary, by their frank acknowledgment of the inadvertence which led them into their position, and their prompt and full reparation of that inadvertence, they not only have removed all just grounds of criticism, but also have, indeed, qualified themselves to extort commendation, and to repel the condemnation and humiliation sought to be visited upon them." The proceedings are set out in exhibits, which include the corre-

spondence, applications, etc., relating to the admission of the relators to practice as alleged in the answer.

One of the exhibits is the report of the Commissioner of Pensions containing the depositions, etc., taken in his preliminary investigation.

The following extract is taken from the concluding portion of the answer: "He denies that the so-called testimony 'relied upon in support of the charges is and was in direct disregard of the settled rules of evidence,' because, as above set forth, it was not claimed that witnesses testified orally in support of said charges. The citation set out with great particularity the facts which the relators were called upon to answer, and specifically set out and referred to the facts deemed important in the charge, and also set out certain documentary evidence in the form of letters and extracts from letters written by the relators to their clients, which letters and extracts from letters had been procured through the taking of the depositions as aforesaid before the issuing of the citation. The citation also referred, specifically, to the original warrants bearing the indorsements of the clients of the relators and of the said relators themselves, which were on file in the public records of the department. The answer of the relators did not deny the dealing by them in the warrants, as charged, although it raised the question as to the legal import of their acts in the premises, and denied any guilty intent or knowledge in the performance of such acts. In their original response, the relators set forth a copy of a letter written by them to one of their clients, and, in reply to the suggestion of the Commissioner that they should submit such evidence as they might possess and might desire to offer in support of the allegations of their response, the relators submitted certain exhibits in the form of memoranda made from their files, an exhibit showing the amounts received and refunded by them in each case, and certain letters passing between themselves and certain of their clients, including a letter sent to each of their clients to whom they made refundment; and certain affidavits, six in number. It is accordingly denied that the substantiation of the charges in the citation was made in violation of the settled rules of evidence."

The charge, filed as an exhibit to both petition and answer, and dated April 13, 1907, was directed to and served upon the relators Eugene B. Stevens and Thomas R. Harney doing business under the firm name of Milo B. Stevens & Company, with notice to show cause, on or before thirty days after service, why they should not be recommended to the Secretary for disbarment. The general charge is: "As such attorneys, you, and each of you, are hereby charged with improper, unprofessional, and illegal conduct in connection with each claim for military bounty land jointly filed by you and mentioned in this letter, in resorting to the methods and in committing the specific offenses set forth below." The specific charges related to claims in the names of fourteen persons in succession, and charge the purchase of the land warrant of the respective clients at less than its market value, through failure to inform them of its actual value, and misleading them as to the same. The charges are accompanied by letters of Milo B. Stevens & Company to the client relating to the purchase, etc. These are too long for insertion in full, and some of them only will be stated here chiefly as summarized in the answer of relators thereto, with their reply to the same. One charge relates to Pygall's case, in which the following extract from a letter of relators to Pygall on December 16, 1904, is quoted: "It is going to be very difficult to obtain a duplicate of the bounty-land warrant that was issued to your mother and five children, because it is going to be difficult for you to furnish the required evidence. However, we have concluded to try the case if the surviving heirs at law will agree to sell the warrant to us for $100 cash, provided we secure it. If the surviving heirs will agree to the above, we will make no charge for our services in prosecuting the case, and we will pay for the advertisements that will have to be inserted in the newspapers concerning the loss of the warrant. We will be put to considerable expense in the matter, and, besides, we will have to take all the chances of success." It is charged that they well knew that the duplicate warrants, if issued, could be sold for not less than $480, and made no statement as to actual value, but attempted to enter into a champertous and illegal contract to pay the expenses incident to the prosecution of the claim,

and to absorb over three fourths of the value of the warrant if issued. "Any written or oral contract which you may have entered into to that end is wholly void and in violation of sec. 2436, Rev. Stat., U. S. Comp. Stat. 1901, p. 1498." Notice was given that the claim had been allowed by the department and forwarded to the claimant.

The answer returned to this was:

(1) It was not possible to know, and parties did not know, what would be the value of the warrant when issued.

(2) The claimant was not informed of the actual value of the warrant because the same was not known. Relators did not profess to fix any value on the warrant, unless the offer to purchase at a set price be construed into such an attempt, and did not attempt to mislead the claimant as to any sources of information accessible as to the value of the warrant, or say anything inviting reliance upon the offer to the exclusion of any inquiries they might see fit to make. It was further said, as regards a champertous and illegal contract: "We do not admit that our letter is justly capable of any such construction. We were not undertaking to induce the claimants to *divide* the produce or fruit of our services, which is essential to champerty, but we frankly admit that we were endeavoring to buy, in advance, the subject of the claim, and this, we submit, we might lawfully do against the whole world, except the claimants whose privilege it was in the end to refuse to carry the bargain into effect. This consideration is involved in the third allegation to which we pass:

"(3) That any written or oral contract which we may have entered into in the premises may have been void under sec. 2436, U. S. Rev. Stat., may be admitted, but that it was *in violation* of that section is respectfully denied, for the reason that that section does not forbid such agreements; it only makes them void; and it has been so frequently adjudged that the invalidity of such and similar agreements is available only to the claimant, who may, or may not, insist upon such invalidity, that it seems necessary only to add that, as all persons are equally presumed to know the law, the claimants must be presumed to know that, at the end of our labors and the rendition

of our services in the premises, it remained for them, and them only, to recognize or to repudiate any supposed obligation on their part in the premises."

It was then added that the facts in the case were most complicated, and the services involved many and great difficulties. That, on December 5, 1906, Pygall wrote that he had received the warrant, and offered to send the same for $100; but hearing, on inquiry at the department, that an order had been issued directing warrants to be delivered to none other than the claimants, and that it did not look with favor upon the practice of attorneys buying warrants from their clients, they wrote to Pygall on December 12, 1906. This letter explained the attitude of the department, and asked him to dispose of the warrant and remit their fee of $10.

The charge in the Graves case was that, on October 5, 1903, relators filed application for a duplicate military warrant for the party living in Jackson county, Tennessee. Duplicate issued April 27, 1904, and was delivered to relators May 19, 1904. During May, 1904, they induced the client to assign said warrant to them for $100, and on July 30, 1904, the warrant was sold through William J. Johnson to Abram Matthews for $364.90. The answer to this was as follows: "It is true that we made the application stated and received an assignment of the said warrant for the sum of $100. We have no knowledge as to the allegation that the said Johnson sold the warrant for the sum mentioned, except on information and belief, and, in selling the said warrant, the said Johnson was not acting for us in the transaction."

The Monaghan-case charge was that relators prosecuted the claim to successful issue for Margaret Monaghan, widow, and had been certified a fee of $25 under fee agreement filed. Said warrant was issued July 7, 1905, and delivered to relators on July 24. On August 7, 1905, they induced said client to assign said warrant to one of them, Thomas R. Harney, for the sum of $200, and said warrant was sold to W. R. Abbott by R. A. Fennell, of Washington, District of Columbia, for $720. The answer was as follows: "It is true that the warrant in this case was purchased by us for $200, but we had no relation whatever to the sale thereof to Abbott by Fennell."

The McKean-case charge was that respondents filed this claim for a land warrant on March 8, 1905, for claimant, a resident of Guadaloupe county, Texas, and, during the pendency of the claim, entered into an agreement by which the warrant, if issued, was to be assigned to them for $75. The warrant was issued December 1, 1905, and delivered on February 7, 1906, to them, they having certified a fee of $10 for services rendered in prosecution of the claim. The warrant was assigned to said Thomas R. Harney, one of the relators, in consideration of $75, and was, on February 21, 1906, sold by them for $240. The answer to this was: "These allegations are true, except that we waived our fee of. $10 and made no attempt to collect the same.

In the Reddick case the charge was that the respondents filed the claim for Sallie B. Reddick, of Los Angeles, California, for warrant which was issued August 28, 1905, and delivered to relators on September 11, 1905. That, on September 16, 1905, they induced her to assign the warrant to Thomas R. Harney, and said warrant was sold to W. R. Abbott by R. A. Fennell, September 19, 1905, for $720. To this they answered: "This warrant was purchased by us for $200; we received no fee; and there were some expenses incident to the purchase of the warrant. We had no relation to the alleged sale to Abbott by Fennell, and the same was not made on our account."

In the Shirkey case the admission was that the warrant was delivered to them September 30, 1904; they induced Shirkey to assign the same to them for $150 on March 23, 1905, and resold the same on April 25, 1905, for $540. That they received no fee in the case, and paid other counsel for services in connection therewith.

Additional cases to those specifically stated were five in number. The charge gave the names, and dates of issue of warrants, and charged that the several clients were induced to assign their warrants to their attorneys for the smallest sums possible, and that the respondents then resold the same at the highest prices obtainable in violation of secs. 3 and 4 of the act of July 4, 1884, and in violation of professional duty to said clients. To this they answered as follows: "We admit that we purchased

the warrants in these cases, but, in each instance, for a sum agreed to by the claimants, and we admit that we sold the warrants at the best prices which we could obtain; but we deny that, in so doing, we violated any of the provisions of secs. 3 and 4 of the act of July 4, 1884.

"These sections of the act mentioned prohibit the demanding or receiving of compensation for *services in procuring* land warrants, otherwise than in accordance with the provisions of the sections. In no instance did we demand or receive any compensation for our services in excess of that fixed by the law; in every instance we bargained for the purchase of the warrants, and none of the claimants in these, or any of the other cases, could possibly have understood otherwise. We admit that our agreements were of the nature contemplated by sec. 2436 U. S. Rev. Stat.; but, as hereinbefore stated, that section does not prohibit such agreements, but merely renders them void to the extent and in the sense that it was the privilege of the claimants at any time to repudiate the agreements; and we were powerless to enforce them against the claimants should they set up their invalidity. To what extent our action in the premises may be deemed reprehensible, or the severe punishment threatened us be justifiable, we consider hereinafter."

The conclusion of the answer is in the nature of an argument in respect of legal obligations to clients, the character of said warrants and difficulty of obtaining anything for them, etc. The following is the paragraph in relation to the knowledge of and acquiescence of the department in such practices: "When we entered the field of procuring these warrants, we found an established practice, of many years' standing, as we believe, of attorneys dealing in warrants of their own procurement, which practice we had reason to believe, and believed, was with the full knowledge of the bureau, and which not only was not the subject of any rule, but which, also, had not been made the subject of any criticism by the bureau, according to either our knowledge or surmise. Moreover, throughout our transactions in the premises, we had a representative in daily contact with the bureau, and no intimation, direct or indirect, was ever made to either such representative or ourselves, of any suspicion of

impropriety in the prevalent practice. As already stated, in the fall of 1906, we first learned of the discountenance by the bureau of the practice, and immediately abandoned it, as is evidenced by our action in the Pygall case, above stated."

The answer also contained the following:

"2. It is not true that, at the time of filing the articles of agreement in any case, it was not our intention to collect a legal fee for our services, but to obtain, indirectly, greater compensation than is provided by law. It was our original and honest intention to live up to our agreements of employment, if our clients did not change our relation from that of attorney to that of intending purchaser. Had our proposition to purchase in any case been declined, we would have lived up to both the letter and the spirit of our contract of employment, and gone on with our work as attorneys to the end. The suggestion that we were taking advantage of the lack of knowledge of our clients in such matters is met by what is hereinbefore said in reply to the immediately preceding charge and otherwise hereinbefore in relation to the provisions of secs. 3 and 4 of the act of 1884; so much so that we hardly deem it necessary to add that it is not charged or intimated, and it is not true, that we have been guilty of the only thing in respect of which reprobation may be visited upon an attorney dealing with his client in respect of the purchase of the subject of his services, namely, the taking advantage of the client by either misleading him by affirmative statements, or throwing him off his guard by concealing from him, or turning him away from, available sources of information to which he might resort to his advantage.

"3. We submit that the charge that, in filing our articles of agreement, we intended to, and did, for the time being, deceive the bureau, is wholly untenable. The only thing which it was the province of the bureau to require, or which it was interested in knowing in the premises, was whether, in appearing as attorneys for applicants, we had the right so to do and were in a position to make good our undertaking in the premises. How the ultimate disposition of the warrant, after being legally procured, could be any affair of the bureau, and

how, in the premises, the bureau could be deceived, we respectfully protest our inability to appreciate."

On June 1, 1908, relators filed an additional answer in response to the suggestion of the Commissioner that they submit evidence in support of their answer before made.

This answer makes substantially the same defense, and is accompanied by affidavits relating to the practice of the firm, and the knowledge of the department of the practices of attorneys, and acquiescence therein.   The additional allegation is that relators have returned to each of their clients the profit made by the purchase and sale of their warrants.   The following account called "exhibit refundment" was filed, with the receipts of the parties for the money returned in each case.   This shows the name of the client, amount paid for warrant, amount sold for, fee paid or deducted, and balance refunded, as follows:

| Name of applicant. | Acres. | Paid. | Sold. | Fee. | Refunded. |
|---|---|---|---|---|---|
| Besser, James_____ | 80 | $250. | $440. | Paid. | $190. |
| Bothwell, Bridget_____ | 160 | 225. | 704. | $10 ? | 469. |
| Bull, George_____ | 160 | 200. | 465.60 | 10 ? | 255. 60 |
| Cannon, Elizabeth_____ | 120 | 150. | 349.20 | 10 ? | 189.20 |
| Clark, Robert_____ | 160 | 200. | 465.60 | 10 ? | 255.60 |
| Clary, Sarah A_____ | 160 | 190. | 560. | 10 ? | 360. |
| Eaton, Mary E_____ | 160 | 200. | 680. | 25 | 455. |
| Brought forward_____ | _____ | 1415. | 3664.40 | 75. | 2174.40 |
| Fitzgerald, Henry W_____ | 120 | 200. | 349.20 | 10 ? | 139.20 |
| Hickman, Letitia J_____ | 160 | 75. | 680. | 25 | 580. |
| Gipson, Sallie_____ | 80 | 100. | 360. | 10 ? | 250. |
| Hardeman, Mary E_____ | 120 | 120. | 582. | 10 ? | 452. |
| Hogan, Catherine _____ | 160 | 452.25 | 600. | Paid. | 147.75 |
| Hollenbeck, Jane _____ | 160 | 170. | 465.60 | 10 ? | 285.60 |
| Maxwell, Catherine _____ | 160 | 350. | 560. | Paid. | 210. |
| McKean, Wm. C_____ | 40 | 50. | 240. | 10 ? | 180. |
| McQuage, Daniel P _____ | 160 | 200. | 520. | 10 ? | 310. |
| Monaghan, Margaret _____ | 160 | 200. | 680. | 10 ? | 470. |
| Reddick, Sallie B _____ | 160 | 200. | 680. | 25 | 455. |
| Shirkey, John (dec'd)_____ } Pauline Clark, *et al*_____ } | 120 | 150. | 432. | 10 ? | 272. |
| Smith, Sarah F_____ | 160 | 208. | 704. | 10 ? | 486. |
| Stevens, Eliza _____ | 120 | 300. | 510. | 10 ? | 200. |
| Teel, Geo. (dec'd) _____ } Elvira E. Graves, child____ } | 80 | 100. | 340. | 10 ? | 230. |
|  |  | $4290.25 | $11367.20 | $235 | $6841.95 |

The relators demurred to the answer of respondent. This was sustained July 3, 1908, and on July 6, 1908, judgment was entered sustaining the petition and granting its prayer for the writ. From this the respondent gave notice of appeal.

The subsequent proceedings relating to this appeal, which form the subject of two special appeals allowed by the court, necessitate a further statement.

The appeal was sought to be prosecuted under secs. 1000 and 1001, Rev. Stat. as an appeal brought up by the United States, and by direction of a department of the government, without bond. The respondent had been represented in the trial by the United States District Attorney under direction of the Attorney General, and by the Assistant Attorney General for the Department of the Interior; and the appeal was by the direction both of the Department of Justice and that of the Interior.

Upon motion of the petitioners, the court directed an appeal bond to act as a supersedeas to be filed by the respondent in the sum of $50,000. To this the respondent entered an exception. Afterwards, the counsel aforesaid filed a notice to the clerk that the appeal prayed and taken was by direction of the Attorney General and by the Secretary of the Interior, and "is to be treated in all respects as a United States case."

The respondent then applied for a special appeal from the order requiring the supersedeas bond of $50,000.

The court of appeals has three terms during the year. The first term begins on the first Tuesday of October; the second the first Tuesday after the first day of January; and the third on the first Tuesday of April in each year. The cases for submission are generally disposed of at the April term, about the middle of June, when it has been the practice of the court to keep the term open by adjournment from day to day until the commencement of the October term, so that necessary orders may be entered during the interval as occasion may require.

On the day that this special appeal was applied for, each member of the court was absent from the District of Columbia. The chief justice was in Clark county, Virginia, Mr. Justice Robb in Falmouth, Massachusetts, and Mr. Justice Van Orsdel was traveling in Nebraska.

The application was submitted to the chief justice on July 10, and an order indorsed thereon and signed by him, allowing the appeal. It was then sent to Mr. Justice Robb, to whom the chief justice wrote explaining his action and asking him, if he approved, to sign the order. This he did, and the same was returned to the clerk of the court of appeals, who filed and entered the same as directed. When certified to the trial court, it was ordered that the special appeal be granted as a supersedeas upon the appellant's giving bond in the sum of $50,000. Exception was taken to this order, and another special appeal therefrom was prayed on July 17, and was allowed in the same manner as the former, with further order directing that the writ of mandamus be stayed without supersedeas bond.

It does not appear from the record when and by whom the original answer to the petition was made. When the amended answer was filed, June 23, 1908, the Secretary of the Interior was absent from the District of Columbia on public business, and the same purporting to be in his name and for him was sworn to by Frank Pierce, First Assistant Secretary of the Interior and then acting as Secretary. The Secretary was absent during the proceedings aforesaid, and it seems that, when the writ was ordered to James R. Garfield, Secretary, it was directed to be served on the acting secretary aforesaid.

It may be added that it has been the practice of the justices of the court of appeals, for a number of years, to allow special appeals and make formal orders as in this case, during the summer recess, and the power has never before been questioned.

Motions have been filed by the appellees to vacate the orders allowing the special appeals, and to dismiss the same, and also the regular appeal taken from the final order in the cause.

The grounds assigned are:

1. The allowance of appeal is void because not made in the District and as a court, but by two members of the court apart from each other.

2. If the orders are not void, they are not such special appeals as are within the meaning of sec. 7 of the act of February 9, 1893, giving jurisdiction to grant special appeals from interlocutory orders.

3. Even if the orders of allowance are not void, and are such as may be made under said act, so much of the order as attempted to stay the writ of mandamus is void for the following reasons: (1) It was beyond the power of the court to stay the execution of the writ in view of the court's own rules, and the general rules of appellate practice, and also under sec. 1282, D. C. Code [31 Stat. at L. 1282, chap. 854]. (2) Because the effect of the action of the court was to reverse an order of the lower court whose action can only be reviewed on an appeal regularly taken from the order of the lower court. (3) Because, on July 17, 1905, the writ of mandamus had been executed and there was no proceeding to supersede. (4) The appeal in the main case must be dismissed because the appellant has not given bond as required by the order of the lower court and the rules of the court of appeals.

*Mr. Daniel W. Baker,* United States Attorney for the District of Columbia; *Mr. Stuart McNamara,* Assistant; *Mr. George W. Woodruff,* Assistant Attorney General, Interior Department, and *Mr. F. W. Clements,* First Assistant Attorney General, Interior Department, for the appellant.

*Mr. Henry E. Davis, Mr. William T. S. Curtis, Mr. Ralph P. Barnard,* and *Mr. Guy H. Johnson* for the appellees.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

1. The primary question involved in the several motions to dismiss the general and special appeals is, whether the Secretary of the Interior is entitled to prosecute the appeal from the judgment awarding the writ of mandamus, under the direction of his own, and the Department of Justice, without giving the bond required in ordinary cases; for, if he is not, the general appeal must be dismissed. Such dismissal would necessarily carry with it the special appeals without regard to the questions raised in the motion to dismiss them.

The right to appeal without bond in this case is claimed under secs. 1000 and 1001, Rev. Stat., U. S. Comp. Stat. 1901, pp. 712, 713, which read as follows:

Section 1000. "Every justice or judge signing a citation on any writ of error shall, except in cases brought up by the United States or by direction of any department of the government, take good and sufficient security that the plaintiff in error or the appellant shall prosecute his writ or appeal to effect, and, if he fail to make his plea good, shall answer all damages and costs where the writ is a supersedeas and stays execution, or all costs only where it is not a supersedeas as aforesaid."

Section 1001. "Whenever a writ of error, appeal, or other process in law, admiralty, or equity issues from or is brought up to the supreme court or the circuit court, either by the United States or by direction of any department of the government, no bond, obligation, or security shall be required from the United States, or from any party acting under the direction aforesaid, either to prosecute said suit, or to answer in damages or costs. In case of an adverse decision, such costs as by law are taxable against the United States, or against the party acting by direction, as aforesaid, shall be paid out of the contingent fund of the department under whose directions the proceedings were instituted."

2. It cannot be doubted that this is an action at law the proceedings and judgment in which, under ordinary conditions, could only be reviewed on a writ of error. It comes here on appeal as that is the proceeding provided in all cases to review a judgment or decree of the supreme court of the District of Columbia, or any justice thereof, by sec. 7 of the act of February 9, 1893, creating the court of appeals of the District of Columbia. This appeal would seem, therefore, to come within the spirit of sec. 1000, Rev. Stat., though not within its strict letter. But it is unnecessary to express an opinion on this point, as it has been held that sec. 1001 authorizes an appeal from the supreme court of the District, by an officer representing the United States, without bond, when said appeal had been taken by direction of a department of the government. *Leonard*

v. *Rodda,* 5 App. D. C. 256, 265. That was an appeal prosecuted by the warden of the jail from a judgment, in a habeas corpus proceeding, ordering him to release a prisoner committed to jail by order of the police court. Mr. Justice Morris, delivering the opinion of the court, said: "It would be a strange requirement of law if, in the performance of his duty to the United States, and the defense exclusively of the public interests, he should be necessitated to give his individual bond for costs in the prosecution of an appeal in a case of habeas corpus. And it would have exceedingly strange consequences, if the rights of the public in such cases should be made to depend upon the warden's willingness or ability to give his individual bond." And it was also said that sec. 1001 is applicable in the District of Columbia as well as elsewhere. See also *Palmer* v. *Thompson,* 20 App. D. C. 273, 277.

We are asked to reconsider that decision, the contention being that the section is, by its terms, limited to writs of error and appeals in cases brought up to the supreme court or the circuit courts, and that the court of appeals is not included therein. This section was enacted long before the creation of the court of appeals, when appeals and writs of error were taken directly from the supreme court of the District to the Supreme Court of the United States; and it cannot be denied that it expressly applies in all cases appealed from the court of appeals to the Supreme Court of the United States. Section 1000 was originally enacted in 1789, and, read in connection with sec. 1001, as it must be, it is plain that the broad purpose of the two is to secure the right of appeal without bond, in all cases involving a public interest, when the appeal shall be taken by direction of a department of the government. That general intent is not to be thwarted by the subsequent creation of the court of appeals as an intermediate appellate court between the supreme courts of the District and the United States; and it is given effect to substantially by sec. 2 of rule X.

3. It is further contended that a bond is imperatively required by sec. 1282 of the D. C. Code. That section is the last one of the chapter regulating the procedure in mandamus cases,

and requires that, in case of appeal by the defendant, the court shall fix the penalty of the appeal bond necessary to be given to stay the execution or enforcement of the order appealed from. There is no such inconsistency between this section of the Code and secs. 1000 and 1001, Rev. Stat., as to warrant the conclusion that the latter are repealed by it, in so far as the District of Columbia is involved. The section of the Code, therefore, governs in all cases, save in the exceptional ones provided for by the others.

4. It is further contended that a proceeding for mandamus against the Secretary of the Interior is not such a case as comes within the provision allowing appeal without bond in a case brought up either by the United States or by direction of a department of the government. This is founded on the proposition that the performance of the duty required is one resting upon the person to whom the writ is directed, and that the writ is aimed exclusively against him as a person, and does not reach the office. *United States* v. *Boutwell,* 17 Wall. 604, 21 L. ed. 721; *United States ex rel. Bernardin* v. *Butterworth,* 169 U. S. 600, 42 L. ed. 873, 18 Sup. Ct. Rep. 441; *Roberts* v. *United States,* 13 App. D. C. 38.

This is undoubtedly true. If such an action was regarded as against the United States, in fact, it would not lie save by their express consent. At the same time, the interests affected by the action to be performed are those of the United States alone. The only way in which the interests of the officer are affected is his liability for costs. The act which he is directed to perform is an official act that can only be performed while he is in office. Upon his retirement from office before service of the writ, the latter becomes ineffectual. The effect was that, if he vacated the office, his successor could not be substituted as a party in his stead. The suit abates. *Warner Valley Stock Co.* v. *Smith,* 165 U. S. 28, 31, 41 L. ed. 621, 622, 17 Sup. Ct. Rep. 225. That was a suit to enjoin the Secretary of the Interior from assuming to exercise jurisdiction in regard to the disposition of certain lands, and to compel him to issue patents therefor to the complainant. The plaintiff failed in the supreme

court of the District and in the court of appeals, and took a
further appeal to the Supreme Court of the United States.
Secretary Smith having retired from office before a decision of
the final appeal, the suit abated, and the court, so declaring,
ordered the decree in his favor reversed and the bill to be dis-
missed.    The court said that the main object of the bill was to
compel the issue of patents, that the mandatory injunction
prayed for was in effect equivalent to a mandamus, and that
the reasons for holding a suit having this object to have abated,
as to him, by his resignation, are as applicable to the bill in equi-
ty as to a petition for mandamus at common law.    The mischief
resulting from this doctrine, through frequent changes of of-
ficers pending litigation, was remedied by the act of February 8,
1899 (30 Stat. at L. 822, chap. 121, U. S. Comp. Stat. 1901, p.
697), which provides for the substitution of the officer's succes-
sor, or successors, in his stead, and prevents the abatement of the
suit.    The reason for this substitution is that, while the action
may be personal, the interest is not personal, but public.    The
costs in such an action may still be adjudged against the officer,
but, for the same reason, Congress has provided that they shall
be paid out of the contingent expense fund appropriated for the
department.

Now in this case, as was said in *Leonard* v. *Rodda,* 5 App. D.
C. 256, 265, the appellant has no greater interest in the subject-
matter than all other citizens have.    His action was in the line
of the performance of his official duties as an officer of the Unit-
ed States, under their authority and on their behalf.    His ap-
peal was taken in the performance of the same public duty, and
it would have a strange consequence if the rights of the public in
such cases should be made to depend upon his willingness or abil-
ity to give his individual bond.    If he should refuse to incur the
risk of personal liability, no appeal could be taken, and there
would be no means by which the government could avert the
result.    The Secretary of the Interior was of the opinion that
the judgment seriously affected the public interest, and the
Attorney General concurred in that view.    As heads of their
respective departments they directed the appeal to be taken

under secs. 1000 and 1001. We think they had the right to do so. We see no difference between this and an appeal taken by a revenue collector, or the receiver of an insolvent bank, by direction of a department of the government, without bond, which have been upheld as governed by the sections aforesaid. *Schell* v. *Cochran,* 107 U. S. 625, 628, 27 L. ed. 543, 545, 2 Sup. Ct. Rep. 827; *Pacific Nat. Bank* v. *Mixter,* 114 U. S. 463, 29 L. ed. 221, 5 Sup. Ct. Rep. 944. In accordance with this view, the many appeals that have been prosecuted from this court to the Supreme Court of the United States, in like mandamus cases, have been allowed without bond required of the officer; and so far the right to do so has never been questioned. For the reasons given, the motion to dismiss the general appeal will be denied.

5. The special appeals from the orders of the trial court requiring a bond to be given in the sum of $50,000, in order to supersede the execution of the original order awarding the writ of mandamus, were allowed in accordance with the doctrines enounced in *Leonard* v. *Rodda,* supra, and again declared hereinbefore. Since the appeal in the main case has been held to operate as a supersedeas, without bond, particular consideration of the motion to dismiss the special appeals is unnecessary and unimportant. The questions raised, particularly that involving the power of the members of the court to act as a court when apart from each other, and outside of the special territorial limits of the court's jurisdiction, present difficulties the discussion of which would greatly prolong this opinion. Without expressing an opinion with regard to them at this time, the motions are formally denied.

6. This brings us to the consideration of the case on its merits.

The Secretary of the Interior is the chief of one of the great Executive Departments of the government, and is clothed with general powers of control and supervision in respect of the manner of the administration of the several minor departments and bureaus thereof. Sec. 161 Rev. Stat., U. S. Comp. Stat. 1901, p. 80. The Pension Bureau, under his control, is an immense

establishment which is constantly engaged in the investigation and adjudication of claims for pensions and bounty-land warrants, the number of which is enormous. These claims are generally filed and prosecuted by pension agents and attorneys. Before the passage of the act of July 4, 1884 (23 Stat. at L. 98, chap. 181), all matters of procedure in the Pension Office, including the admission of attorneys to practice, and their continued recognition, seem to have been governed exclusively by the regulations made by the Secretary. The attention of Congress having been called to alleged irregular practices of attorneys, the House of Representatives, on February 6, 1884, passed a resolution directing the Secretary to furnish such information as he might have touching these matters. His report was made May 7, 1884. In this report it appeared that as many as three hundred and twelve attorneys had been disbarred by the Secretary on proceedings for that purpose. In the pension appropriation act of July 4, 1884, was incorporated a number of provisions relating to the regulation of the business of the office. Section 3 provided that "no agent, or attorney, or other person, shall demand or receive any other compensation for his services in prosecuting a claim for pension or bounty land than such as the Commissioner of Pensions shall direct to be paid to him, not exceeding $25," the same to be received only after the claim shall have been allowed. Section 4 provides that duplicate articles of agreement shall be filed in the department setting forth the fee agreed upon by the parties. Where no fee agreement is filed, the fee shall be "$10 and no more." The form of the articles of agreement is prescribed. It further provides that any agent, attorney, or other person prosecuting any claim for pension or bounty land "who shall directly or indirectly contract for, demand, or receive or retain, any greater compensation for his services or instrumentality in prosecuting a claim for pension or bounty land than is herein provided, * * * or who shall wrongfully withhold from a pensioner or claimant the whole or any part of the pension or claim allowed and due such pensioner or claimant, or the land warrant issued to any such claimant, shall be deemed guilty of a misdemeanor," punishable by fine or imprisonment, or both.

Section 5 provides: "That the Secretary of the Interior may prescribe rules and regulations governing the recognition of agents, attorneys, or other persons representing claimants before his department, and may require of such persons, agents, and attorneys, before being recognized as representatives of claimants, that they shall show that they are of good moral character and in good repute, possessed of the necessary qualifications to enable them to render such claimants valuable service and otherwise competent to advise and assist such claimants in the presentation of their claims, and such Secretary may, after notice and opportunity for a hearing, suspend or exclude from further practice before his department any such person, agent, or attorney shown to be incompetent, disreputable, or who refuses to comply with the said rules and regulations, or who shall, with intent to defraud in any manner, deceive, mislead, or threaten any claimant or prospective claimant by word, circular, letter, or by advertisement." 23 Stat. at L. 99, chap. 181, U. S. Comp. Stat. 1901, p. 3296.

Among the regulations prescribed thereafter on July 11, 1884, by the Secretary of the Interior, are secs. 5 and 9 as follows:

"Sec. 5. In the case of a firm, the names of the individuals composing the firm must be given, and the certificate and oath as to each member of the firm will be required."

"Sec. 9. Whenever an attorney or agent is charged with improper practice in connection with any matter before a bureau of this department, the head of the bureau shall investigate the charge, giving the attorney or agent due notice, together with a statement of the charge against him, and allow him opportunity to be heard in the premises. When the investigation shall have been concluded, all the papers shall be forwarded to the department with a statement of the facts and such recommendations as to disbarment from practice as the head of the bureau may deem proper, for the consideration of the Secretary of the Interior. During the investigation the attorney or agent will be recognized as such unless for special reasons the Secretary shall order his suspension from practice."

As shown by the statement of the case heretofore made, the Pension Commissioner, some time prior to April 13, 1907, began an investigation of the general practices of attorneys, and agents, taking, in the course thereof, depositions of many persons relating thereto. No charge had then been made against any particular person, and the investigation was had for the information of the Commissioner. Founded on such information, the Commissioner, on April 13, 1907, served upon Eugene E. Stevens and Thomas R. Harney, who, by their own statement at the time of their admission to practice, made in accordance with sec. 5 of the regulations above quoted, composed the firm of Milo B. Stevens & Company.

7. The first point raised on the charge of the petition that the proceeding was not in accordance with due process of law is that the charge against the relators is founded on depositions taken *ex parte,* and without their knowledge. The formal and regular way to proceed in such cases is to found the charges upon which the attorney is cited to show cause why he should not be disbarred, upon an affidavit stating the facts. *Ex parte Wall,* 107 U. S. 265, 271, 27 L. ed. 552, 555, 2 Sup. Ct. Rep. 569. But such affidavits are necessarily *ex parte.* In no proceeding before the courts has it ever been held that the party charged with the offense should have notice of taking the affidavit and an opportunity to controvert it in advance. It is merely the foundation of the charge which he is called upon to meet. Using it for that purpose and using it as proof of the charge on the trial are very different things. The Commissioner had the right to make investigations regarding the practices before his office, and to use facts so ascertained as the basis of a formal proceeding to disbar an attorney. Upon the charges so made, if not admitted, he is not empowered to prosecute to judgment, save upon evidence submitted in the usual way, with opportunity to the accused to hear and examine the witnesses, and to introduce proofs on his own behalf. The department did not exceed its jurisdiction or deny due process of law in this respect, and the judgment appealed from cannot be supported on this contention.

8. It is admitted that due notice of the charges was given to the relators Stevens and Harney; that they were accorded ample time to answer the same; that they were not denied the right to offer evidence; and that they were accorded a hearing. The contention is that the respondent exceeded his jurisdiction and proceeded without due process of law in two particulars.

(1) Without notice to relators, or opportunity to be confronted with the witnesses, the Secretary made an *ex parte* investigation of the charge in the answer that the practice of attorneys in buying the warrants of their clients had long been known to the officers of the Pension Bureau, had been acquiesced in, and had grown into a usage, which relieved their conduct of any taint of illegality or impropriety. The answer admits that this investigation was privately made, but avers that it was for the sole purpose of acquiring information by the Secretary as to the conduct of the officials of the bureau in such matters; and that the Secretary held, as matter of law, that the alleged facts, if true, constituted no ground of defense to, or justification of, such practices. The truth of the answer is admitted by the demurrer. If the conclusion of the Secretary was a sound one, then the relators were denied no constitutional right by his private investigation of the truth of the charge made against his subordinates. That he was right, we think is clear. The knowledge by officers of the bureau of the existence of such practices, and their apparent acquiescence therein by reason of failure to condemn, or disapprove of the same, could not change their nature, if illegal and improper, and confer legality and regularity upon them. Long and universally recognized rules of law for the protection of clients and the observance of honor among lawyers cannot be abrogated by the toleration, or the connivance of officials charged with the administration of the law.

(2) The mass of depositions taken by the Commissioner in the course of the preliminary investigation before referred to, as required by the regulations (sec. 9), accompanied his report made to the Secretary. The charge is that the Secretary considered the same as evidence in arriving at his decision disbarring the relators, and that his conclusion was in part founded

thereon. This charge was flatly denied in the Secretary's answer. He states explicitly that no evidence was taken or considered save such as was contained in the answer of the relators to the charges against them, and exhibits appended thereto, because, in his judgment, the answers contained a substantial admission of the specifications of the charge, thereby rendering unnecessary the taking of any evidence in their support. This allegation is also admitted by the demurrer. It is contended, however, that the consideration of this evidence is shown by the Secretary's final action of May 1, 1908, wherein he directs the Commissioner of Pensions to no longer recognize relators as attorneys, in the following paragraph thereof: "After careful consideration of your recommendations, the testimony in the case, the arguments of counsel, and the authorities cited by them, I am convinced," etc. The denial of the answer is not inconsistent with this record, for it says that the testimony was contained in the admissions of and exhibits to the answer, and none other was heard or considered. An examination of relator's reply to the specific charges bears out this conclusion. The citation to answer, it will be remembered, contained specific charges that the relators had been guilty of champerty in Pygall's case; that they had purchased the warrants issued to them for their clients from the latter; had misled and deceived clients as to the value of the warrants; and resold the warrants at great profit; had filed fee agreements with no intention to be bound by the same; and had indirectly received fees in violation of law. The response to the citation took up each specific charge, and, as shown by the recitals of the same in the preliminary statement, there was a substantial admission of the acts charged in some of the cases at least. Some of the admissions were more direct than others, as will be seen by reading the answers. In some of them there is an evasion of the charge as to profit made in the resale. But these omissions were subsequently supplied by their statement of profits refunded to twenty-two clients, the sum total of which is nearly $7,000. The denial of the fact that they did not know the actual value of the warrants at the time of purchase (even if that be a defense to the charge of trading

with clients) was met by the fact that they were constantly making offers for warrants, and that each one resold subsequently was at a considerable profit. Take, for example, the admission in the Reddick case: The charge was that the warrant was delivered to relators September 11, 1905, purchased from the client on September 16, for $200, and resold on September 19, 1905, to one Abbott by one Fennell for $720. The answer thereto admits the purchase for $200, but says that relators received no fee, and had no relation to the sale by Fennell to Abbott, only three days after their own purchase. They do not say what profit they made in this transaction, but the "refundment statement" shows that they refunded in this case $455 after deducting a fee of $25.

From these admissions, the Secretary was of the opinion that they were buying the warrants without giving information of value to their clients, were misleading them in regard to their interests, and defrauding them, and were also exacting indirectly more than the fees fixed by the statute in such cases. Having the jurisdiction to determine the weight of these admissions and evidence, direct and circumstantial, the soundness of his conclusions thereon cannot be inquired into in this proceeding. "Whether he decided right or wrong is not the question. Having jurisdiction to decide at all, he had necessarily jurisdiction, and it was his duty, to decide as he thought the law was; and the courts have no power whatever, under those circumstances, to review his determination by mandamus or injunction." *United ed States ex rel. Riverside Oil Co. v. Hitchcock,* 190 U. S. 316, 324, 325, 47 L. ed. 1074, 1078, 23 Sup. Ct. Rep. 698.

9. The final contention is that the Secretary proceeded in excess of the jurisdiction conferred upon him by sec. 5 of the act of July 4, 1884. That section confers on him the power to make regulations governing the recognition of agents, attorneys, and other persons representing claimants before his department, and to require that they shall show that they are of good moral character and in good repute and competent to advise and assist clients; and, further, that he may, after notice and opportunity for a hearing, suspend or exclude from further practice "any

such person, agent, or attorney shown to be incompetent, disreputable, or who refuses to comply with the said rules and regulations, or who shall, with intent to defraud, in any manner, deceive, mislead, or threaten any claimant by word, circular, letter, or by advertisement."

It is contended that the words of the statute are too vague and uncertain in their definition of the conduct justifying the suspension or exclusion of an attorney from practice before the department to be capable of enforcement. Proceedings of the kind, notwithstanding they may have very serious and damaging consequences, are not criminal proceedings. The word "disreputable" is the only one bearing on this controversy to which any uncertainty can be attributed. It was probably used as the equivalent of unprofessional and as applying more appropriately to agents and other persons who, as well as attorneys, might be permitted to practice before the department. The courts were possessed of the inherent power, at the common law, to inquire into the conduct of attorneys admitted to practice before them, and to disbar them when found guilty of unprofessional conduct. The term was well understood by them and by the attorneys in general, and there was no more practical uncertainty in its application than in that of the word defraud, which is so commonly used in criminal statutes without definition. Any conduct violative of the ordinary standard of professional obligation and honor was unprofessional and disreputable. It is rare that statutes have been passed defining or limiting the exercise of this inherent power. Judged by the standard referred to, the admitted conduct of relators was clearly improper and unprofessional. It is not necessary, however, to consider whether the court, having no power to review the action of the Secretary for error, can inquire whether he gave an erroneous construction to the statute. Nor is it necessary to consider whether the Secretary, who in these matters is vested with judicial power, and whose relations to attorneys practising before his department are substantially the same as that of a court to attorneys admitted to its bar, has any inherent power in such matters of which the statute is merely declaratory.

In addition to disreputable conduct, the statute warrants the exclusion from practice of one who refuses to comply with the rules and regulations, or who shall, with intent to defraud, in any manner, deceive, mislead, or threaten a claimant, by word, circular, letter, or by advertisement. The same statute prohibits the demand of a fee in any case of more than $25, and requires an agreement therefor, the form of which is prescribed, to be filed in the proper bureau. It is further made a penal offense for an attorney to directly or indirectly contract for, demand, or receive any greater compensation than that before established. Section 2436, Rev. Stat., U. S. Comp. Stat. 1901, p. 1498, also provides that any disposition of warrants, or land granted or to be granted, made before the issue thereof, shall be void.

The relators were charged with conduct misleading their clients, through omission of duty to furnish them information, with misconduct in filing fee agreements with no intention to observe the same, and subsequently waiving the stipulated and lawful fee and indirectly receiving more than the lawful fee through purchase of the warrants at less than their actual value. This purchase of warrants was also charged as illegal under the provisions of sec. 2436, Rev. Stat. Evidently the Secretary considered that the evidence direct and circumstantial, furnished by the answer and its exhibits, sustained the charge of defrauding clients, and violating the provisions of the law denouncing the receipt of fees in excess of the legal rate, and declaring transfers of warrants void. The answer to the charge expressly admitted that the purchase of warrants was void under sec. 2436, but defended against the same on the ground that the section simply renders such sales void, at the option of the seller, and does not provide any penalty for making the purchase; wherefore it is not an unlawful act. It is quite true that there is no penalty imposed as a punishment for violating this section, but that does not relieve a purchase from being an illegal act. It was intended to prevent fraud in the administration of the land laws, and made a rule which was violated by the relators. The charge against the relators was of "improper, unprofessional, and illegal conduct" in the matter of the cases specified. The

judgment of the Secretary, communicated by letter to the Commissioner for further communication to the relators, recites his conviction that they "have transacted with their clients a business which is clearly incompatible with their obligations as attorneys, and with the laws, rules, and regulations under which they were recognized and permitted to represent claimants before this department and its bureaus." Having jurisdiction of the subject-matter, and having found that there was sufficient evidence to show conduct violative of the rules and regulations, his judgment is not subject to review; and it matters not whether matter merely showing that one is disreputable can be ground of action under the statute.

10. An incidental question arises on this record which requires some consideration. Two of the relators only were disbarred. The other two, claiming to be members of the firm of Milo B. Stevens & Company, have joined in this petition. The first two were admitted under the rule to practise in their own and in the name of Milo B. Stevens & Company, having stated that they alone composed the firm. As the business of that firm had belonged in part to Milo B. Stevens, who had died, they were required to procure the consent to their use of their firm name by his representatives. This they did, and were then admitted. Neither the widow of Milo B. Stevens, now the wife of the relator Harney, nor Evelyn Stevens, the infant child of Milo B. Stevens, had ever been admitted to practise before the department. They could not so practise under the name of Milo B. Stevens & Company, without complying with the regulation. They have nothing of which they can complain, and were, therefore, neither necessary nor proper parties to the proceeding.

We are of the opinion that the court should have overruled the demurrer to the respondent's answer to the petition. The judgment will therefore be reversed, with costs, and the cause remanded for further proceedings not inconsistent with this opinion.                                   *Reversed.*

A petition by the appellees for a rehearing was denied January 6, 1909.